William Frost Manhattan City Attorney 1101 Poyntz Manhattan, Kansas 66502-5460
Dear Mr. Frost:
You request our opinion concerning the city's ability to establish maximum speed limits of less than 30 miles per hour in a residential district and whether the city may establish traffic control devices where the guidelines set forth in the uniform traffic control manual do not warrant such a placement. The speed limit issue is of considerable importance because according to the league of Kansas municipalities there are at least 100 cities which have ordinances establishing speed limits of less than 30 miles per hour in residential districts. Consequently, a review of the statutes in this area is necessary.
K.S.A. 8-1336(a)(2) provides, in relevant part, as follows:
 "Except when a special hazard exists that requires lower speed for compliance with K.S.A. 8-1335, . . . the limits specified in this section or established as hereinafter authorized shall be maximum lawful speeds, and no person shall drive a vehicle at a speed in excess of such maximum limits;
"(2) In any residence district, 30 miles per hour. . . ."
K.S.A. 8-2002(a)(10) and (d) allow local authorities to alter or establish speed limits as authorized in K.S.A. 8-1338.
K.S.A. 8-1338(a) provides, in relevant part, as follows:
 "Whenever local authorities in their respective jurisdictions determine on the basis of engineering and traffic investigation that any maximum speed permitted under this act is greater or less than is reasonable and safe under the conditions found to exist upon a highway or part of a highway, the local authority may determine and declare a reasonable and safe maximum limit thereon which:
"(1) decreases the limit at intersections. . . ."
K.S.A. 8-2001 provides, as follows:
 "The provisions of this act shall be applicable and uniform throughout this state and in all cities and other political subdivisions therein, and no local authorities shall enact or enforce any ordinance in conflict with the provisions of this act unless expressly authorized; however, local authorities may adopt additional traffic regulations which are not in conflict with the provisions of this act." (Emphasis added).
Both K.S.A. 8-1336 and 8-1338 are part of the uniform act regulating traffic. K.S.A. 8-2204, as amended by L. 1993, ch. 259, sec. 9.
The legislative history of speed limits in residential districts begins in 1935 when K.S.A. 8-124 allowed cities to regulate the speeds of automobiles within the corporate limits. However, in 1937, chapter 283 was enacted which repealed K.S.A. 8-124. Chapter 283 was modeled upon the uniform vehicle code — its object being to provide a uniform regulation of vehicular traffic throughout the state. Ash v. Gibson, 146 Kan. 756,762 (1937).
 "By the enactment of chapter 283 the legislature evinced an intention to cover the field of traffic regulation throughout the state. The broad and general powers delegated by statutes to municipalities to exercise control over streets are subject to the limitation that the ordinances must not be inconsistent with the laws of the state or in contravention of the declared policy of the state as found in its statutes." Ash at p. 764.
Section 32 of chapter 283 (K.S.A. 8-532, repealed by L. 1974, ch. 33, sec. 8-2205) established a limit of 20 miles per hour in a business district and 25 miles per hour in a residential district. The speed limit in residential districts was increased to 30 miles per hour in 1938. (L. 1938, ch. 58, sec. 2.) Section 33 of chapter 283 (K.S.A. 8-533
repealed by L. 1974, ch. 33, sec. 8-2205) gave local authorities the power to lower the speed limit at intersections if an engineering and traffic investigation so warranted. In Harshaw v. Kansas City PublicService Company, 154 Kan. 481 (1941) the supreme court concluded that a city ordinance regulating speed at 35 miles per hour on boulevards was abrogated by chapter 283 — citing section 7 of chapter 283 which is the uniform provision found at K.S.A. 8-2001.
K.S.A. 8-532 and 8-533 remained unchanged until 1957 when K.S.A. 8-533
was amended to give cities the authority to alter speed limits in business and residential districts if warranted by an engineering and traffic study. (L. 1957, ch. 62, sec. 2). However, in 1974 the legislature revamped the uniform code in order to bring Kansas in fuller conformity with the uniform vehicle code. Report on Kansas LegislativeInterim Studies to the 1973 Legislature, December 1972, p. 552; Reportsof Special Committees to the 1974 Kansas Legislature, part II, p. 103-8 and 103-9. K.S.A. 8-532 and 8-533 were repealed and replaced with the current provisions which are found at K.S.A. 8-1336 and 8-1338. (L. 1974, ch. 29, secs. 3 and 5).
After reviewing this legislative history and the plain meaning of K.S.A. 8-2001, it is clear that the legislature has preempted the field of speed limits in residential areas and any city ordinance which prescribes a speed limit of less than 30 miles per hour in a residential district conflicts with state law and is void. Furthermore, the statutes are uniformly applicable to all cities and therefore the latter may not use home rule powers to charter out of K.S.A. 8-1336.
Addressing your query concerning whether local authorities have the power to place traffic control devices — in this case, four-way stop signs at intersections — we review the applicable statutes.
K.S.A. 8-2003 provides in relevant part as follows:
 "The secretary of transportation shall adopt a manual and specifications for a uniform system of traffic-control and traffic-control devices consistent with the provisions of this act for use upon highways within this state."
K.S.A. 8-2005 provides in relevant part as follows:
 "(a) Local authorities in their respective jurisdictions shall place and maintain such traffic-control devices upon highways under their jurisdiction as they may deem necessary to indicate and to carry out the provisions of this act or local traffic ordinances or to regulate, warn or guide traffic. All such traffic-controlled devices hereinafter erected shall conform to the state manual and specifications." (Emphasis added).
K.S.A. 8-2002(a) provides, in relevant part as follows:
 "The provisions of this act shall not be deemed to prevent local authorities with respect to streets and highways under their jurisdiction and within the reasonable exercise of the police power from:
"(1) Regulating or prohibiting stopping . . .
 "(2) Regulating traffic by means of . . . official traffic-controlled devices."
The language in section (a) of K.S.A. 8-2005 has remained unchanged since it was enacted in 1937 as part of the uniform act regulating traffic. (L. 1937, ch. 283, sec. 12). Consequently, it is our opinion that the legislature intended to give local authorities the power to place and maintain traffic control devices as long as the placement of the devices conforms to the manual on uniform traffic control devices (manual). The Supreme Court has rejected the notion that the manual only comes into play after local authorities make the decision to place a traffic control device. Force v. City of Lawrence, 17 Kan. App. 2d 90,94 (1992). The problem which the city of Manhattan faces is that the manual does not mandate the placement of four-way stop signs. Rather, the manual establishes three conditions which may warrant such a placement. [Manual on Traffic Control Devices, section 2B-6 (1988 ed.).] Consequently, the city engineers did not recommend such a placement. A neighborhood group is adamant that the city establish such signs because two children have been killed in recent months and some area residents believe that a four-way stop will solve the problem. The governing body is concerned that if a four-way stop is placed at the intersection contrary to the advice of the city engineers that it will open the city to liability in the event of an accident because the plaintiff may argue that the signs were not required by the manual. The question then becomes what liability may exist where the manual makes the placement of traffic signals discretionary. We will analyze this issue in the context of the four-way stop situation. The following excerpts are from the manual:
Section 1A-1. Purposes of traffic control devices.
"The purpose of traffic control devices and warrants for their use is to help insure highway safety by providing for the orderly and predictable movement of all traffic . . . and to provide such guidance and warnings as are needed to insure the safe and uniform operation of individual elements of the traffic stream."
Section 1A-4. Engineering study required.
"The decision to use a particular device at a particular locationshould be made on the basis of an engineering study of a location. Thus,while this Manual provides standards for design and application fortraffic control devices, the Manual is not a substitute for engineeringjudgment. It is the intent of the provisions of this Manual to bestandards for traffic control devices installation, but not a legalrequirement for installation." (Emphasis added).
Section 1A-5. Meanings of "shall", "should" and "may".
"In the Manual sections dealing with the design and application of traffic control devices, the words `shall', `should' and `may' are used to describe specific conditions concerning these devices to clarify the meanings in this Manual by the use of these words, the following definitions apply:
 "1. SHALL — a mandatory condition. Where certain requirements in the design or application of the device are described with the "shall" stipulation, it is mandatory when an installation is made that these requirements be met.
 "2. SHOULD — an advisory condition. Where the word "should" is used, it is considered to be advisable usage, recommended but not mandatory.
 "3. MAY — a permissive condition. No requirement for design or application is intended."
Section 2A-1. Functions of signs.
"Signs should be used only where warranted by facts and field studies. Signs are essential where special regulations apply at specific places or specific times only, or where hazards are not self-evident. . . ."
Section 2B-5. Warrants for stop signs.
"Because STOP signs cause a substantial inconvenience to motorists, it should be used only where warranted."
Section 2B-6. Multi-way stop signs.
"The "Multi-way Stop" installation is useful as a safety measure at some locations. It should ordinarily be used only where the volume of traffic on the intersecting roads is approximately equal. A traffic control signal is more satisfactory for an intersection with a heavy volume of traffic."
"Any of the following conditions may warrant a multi-way STOP sign installation:
 "1. Where traffic signals are warranted and urgently needed, the multi-way stop is an interim measure that can be installed quickly to control traffic while arrangements are being made for the signal installation.
 "2. An accident problem, as indicated by five or more reported accidents of a type susceptible of correction by a multi-way stop installation in a twelve-month period. . . .
"3. Minimum traffic volumes:
 "(a) the total vehicular volume entering the intersection from all approaches must average at least 500 vehicles per hour for any 8 hours of an average day, and
 "(b) the combined vehicular and pedestrian volume from the minor street or highway must average at least 200 units per hour for the same 8 hours, with an average delay to minor street vehicular traffic of at least 30 seconds per vehicle during the maximum hour, but
 "(c) when the 85-percentile approach speed of the major street traffic exceeds 40 miles per hour, the minimum vehicular volume warrant is 70% of the above requirements."
The Kansas tort claims act (KTCA) creates an exemption from liability for any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty whether or not the discretion is abused. K.S.A. 1992 Supp. 75-6104(e). K.S.A. 1992 Supp.75-6104(h) exempts governmental entities in placing any traffic signal when the placement is a result of a discretionary act.
In Schaeffer v. Kansas Department of Transportation (KDOT), 227 Kan. 509
(1980), (a pre-KTCA case) plaintiff argued that the department of transportation (KDOT) should have placed a curve sign on a highway. KDOT's position was that the specific conditions in the manual for placement of a curve sign were not fulfilled, and, therefore, it had no liability. The court pointed to several sections in the manual which indicated that warning signs were necessary to warn of hazardous conditions and affirmed the trial court's ruling that a highway defect existed under the (now repealed) highway defect act. (K.S.A. 68-419).
 "KDOT argues repeatedly that if the physical configuration of the highway is such that the warrants for warning signs do not mandate a warning sign then there could be no liability for failure to install one even though a hazardous or perilous condition may in fact exist. We do not construe the statutes and the manual so narrowly. It appears obvious that both vest in KDOT the discretion and obligation to maintain adequate warning signs if, in fact, a hazard does exist. In our opinion the manual merely establishes minimum, not maximum, standards for safety. To hold otherwise would place form over substance and would negate the actual objectives of the statutes and manual of effecting uniform traffic control with a maximum amount of protection for the motoring public." Schaeffer at p. 515.
 Carpenter v. Johnson, 231 Kan. 783 (1982) is another failure to sign case, decided after the KTCA was enacted where the court construed the two KTCA exemptions previously cited. Citing various portions of the manual the court concluded that whether or not the placement of the sign is discretionary or mandatory depends upon the totality of circumstances involved and may not be determined as a matter of law. Toumberlin v.Haas, 236 Kan. 138, 142 (1984); Finkbiner v. Clay County, 238 Kan. 856
(1986). In Haas the court dismissed plaintiff's case when he failed to establish through engineering testimony that the placement of any type of sign was warranted or required by the manual.
It is our opinion that the manual establishes a minimum standard of safety and, by its own terms, serves merely as a guideline for professional engineers. It is not a substitute for their judgment. In the Manhattan situation, while the manual does not mandate the placement of a four-way stop, if, in the judgment of the city traffic engineers, a four-way stop is necessary to insure safety at that intersection, then the city may install such a device. If the engineers believe that a four-way stop is not necessary then the city is under no duty to place such signs. If a law suit occurs and one of the issues is the placement of the sign or the failure to sign, it will be up to the fact-finder to determine whether the decision to place or not place the sign was discretionary or mandatory based upon the totality of circumstances.
Summarizing our opinion, cities do not have the authority to promulgate ordinances which alter the state prescribed speed limit of 30 miles per hour in a residential district. Furthermore, cities do have the authority to place and maintain traffic control devices as long as they conform to the manual. However, the manual itself is merely a guideline for professional engineers and is not a substitute for their judgment.
Very truly yours,
 ROBERT T. STEPHAN Attorney General of Kansas
 Mary Feighny Assistant Attorney General
RTS:JLM:MF:jm